# United States Court of Appeals for the Federal Circuit

---

**FRAUNHOFER-GESELLSCHAFT ZUR FÖRDERUNG DER ANGEWANDTEN FORSCHUNG E.V.,**
*Plaintiff-Appellant*

**v.**

**SIRIUS XM RADIO INC.,**
*Defendant-Appellee*

---

2018-2400

---

Appeal from the United States District Court for the District of Delaware in No. 1:17-cv-00184-JFB-SRF, Senior Judge Joseph F. Bataillon.

---

Decided: October 17, 2019

---

DAVID C. MCPHIE, Irell & Manella LLP, Newport Beach, CA, argued for plaintiff-appellant. Also represented by BEN J. YORKS, ALEXIS PASCHEDAG FEDERICO, KAMRAN VAKILI; ALAN J. FRIEDMAN, Shulman Hodges & Bastian LLP, Irvine, CA.

MARK BAGHDASSARIAN, Kramer Levin Naftalis & Frankel LLP, New York, NY, argued for defendant-

appellee. Also represented by JONATHAN CAPLAN, SHANNON H. HEDVAT; PAUL J. ANDRE, Menlo Park, CA.

———————————

Before DYK, LINN, and TARANTO, *Circuit Judges.*

DYK, *Circuit Judge.*

Fraunhofer-Gesellschaft zur Förderung der angewandten Forschung E.V. ("Fraunhofer") sued Sirius XM Radio Inc. ("SXM") alleging infringement of claims of four of Fraunhofer's patents. The district court granted SXM's motion to dismiss for failure to state a claim on the ground that it had a valid license to the patents-in-suit. We conclude that this license defense cannot be resolved on a motion to dismiss. We vacate the judgment, and remand to the district court for further proceedings. We also reverse the district court's denial of Fraunhofer's motion for leave to amend.

## BACKGROUND

Fraunhofer is a partially state-funded non-profit research organization headquartered in Munich, Germany. Over the past three decades, Fraunhofer has developed and patented several inventions related to multicarrier modulation. Multicarrier modulation is a method for transmitting a main data stream over multiple carrier data streams. The utilization of multiple carrier data streams is useful in satellite-based communication networks, where the signal quality for an individual data stream can vary depending on the line of sight between the satellite and the receiver.

On March 4, 1998, Fraunhofer and a third party, WorldSpace International Network Inc. ("WorldSpace"), entered into an exclusive license agreement ("the Master Agreement") related to Fraunhofer's multicarrier modulation technology ("the MCM Intellectual Property Rights"). The Master Agreement gave WorldSpace a "worldwide,

exclusive, irrevocable license, with the right to sublicense, under the MCM Intellectual Property Rights to make, have made, use, have used, sell or have sold MCM Technology (and products and services incorporating or utilizing the MCM Technology) in connection with WorldSpace Business." J.A. 483. The Master Agreement required WorldSpace to pay a $1 million license fee, payable in installments, to Fraunhofer (which was fully paid by December 31, 2000) and to make other payments relating to future patent prosecution. Section 9.5 of the Master Agreement states that "[t]his Agreement shall be subject to, governed by, and construed in accordance with" German law. J.A. 488.

In the late 1990s, SXM began developing its Digital Audio Radio Services ("DARS") System.[1] SXM sought to use Fraunhofer's MCM Technology in the DARS system. Because Fraunhofer had already granted an exclusive license to WorldSpace, on July 24, 1998, SXM entered into a Sublicense Agreement with WorldSpace. The Sublicense Agreement granted SXM a license "to use the WorldSpace Licensed Technology [including the MCM Intellectual Property Rights] for the development, implementation and commercialization of the [SXM DARS] System for transmission in and over the geographic area of the United States and its territories," J.A. 187. On June 7, 1999, the Sublicense Agreement was amended to make the license "irrevocable." J.A. 203.

Thereafter, Fraunhofer assisted SXM in developing a satellite communication system utilizing Fraunhofer's technology. On July 16, 1999, SXM and Fraunhofer entered into a Technical Consulting Contract for "Fraunhofer [to] contribute to the development of the [SXM] DARS

---

[1] References to SXM in this opinion include its predecessor corporations, American Mobile Radio Corporation and XM Satellite Radio Inc.

system in the following areas: System Engineering; Receiver development; Test equipment development and production; [and] multimedia adapter." J.A. 847. The Technical Consulting Contract also confirmed that Fraunhofer and SXM understood that the "patents related to MCM technology are exclusively licensed to WorldSpace," and that SXM had agreed to obtain a license from WorldSpace. J.A. 881. Pursuant to the Technical Consulting Contract, Fraunhofer allegedly constructed for SXM "the [SXM] DARS System . . . using the technologies [allegedly] covered by the [patents that SXM is now accused of infringing]." J.A. 1409.

WorldSpace thereafter ran into financial difficulties. On October 17, 2008, WorldSpace filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. On June 12, 2012, WorldSpace's bankruptcy case was converted to Chapter 7. At the bankruptcy court, WorldSpace rejected the Master Agreement pursuant to section 365(d)(1) of the Bankruptcy Code.[2]

---

[2]    Section 365(d)(1) provides that: "[i]n a case under chapter 7 of [the Bankruptcy Code], if the trustee does not assume or reject an executory contract . . . within 60 days after the order for relief, or within such additional time as the court, for cause, within such 60-day period, fixes, then such contract . . . is deemed rejected." 11 U.S.C. § 365(d)(1).

It is unclear from the district court's decision whether WorldSpace had also rejected the Master Agreement in an earlier agreement approved by the bankruptcy court. *See* J.A. 5 ("A settlement agreement was approved between WorldSpace, Fraunhofer, and [Yazmi] [a third party buyer] and it rejected the MCM license."); J.A. 1409 n.1 ("The agreement stated: 'In the event that Fraunhofer and Yazmi [the buyer] have not entered into an agreement on the going forward business arrangements as provided for in the agreement, the license agreement will be deemed rejected.'

Under the Supreme Court's recent ruling in *Mission Products*, WorldSpace's rejection was equivalent to a breach occurring "immediately before the date of the filing of the [bankruptcy] petition." *Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1658 (2019) (alterations in original) (quoting 11 U.S.C. § 365(g)(1)). This breach gave Fraunhofer the right to terminate the Master Agreement. Fraunhofer did not at the time terminate the agreement but did file an administrative claim for amounts unpaid under the Master Agreement. Nor did WorldSpace terminate the Sublicense Agreement. On July 13, 2009, the bankruptcy court approved a Settlement Agreement between WorldSpace and SXM that "provided that SXM would pay WorldSpace $298,517 in satisfaction of all of its obligations under the sublicense, and emphasized that the sublicense would remain in effect." J.A. 16 (citing J.A. 219, §§ 1, 3). As a result of the Settlement Agreement no further payments were due from SXM to WorldSpace under the Sublicense Agreement, and there is no indication that SXM was otherwise in breach of the Sublicense Agreement. SXM continued to utilize the MCM technology.

In October 2015, many years later, Fraunhofer sent a letter to SXM alleging that SXM was infringing four of its patents: U.S. Patent Nos. 6,314,289 ("the '289 patent"), 6,931,084 ("the '1084 patent"), 6,993,084 ("the '3084 patent"), and 7,061,997 ("the '997 patent") (collectively, "the patents-in-suit"). The '289 patent describes a multi-antenna system used to transmit and receive multicarrier modulation signals. The '1084 patent describes a method used to correct phase shifts that are introduced by echoes that occur during multi-carrier transmission. The '3084 patent describes a method for inserting reference symbols into each carrier data stream which are then used for

---

Fraunhofer and Yazmi never entered into an agreement relating to the MCM License." (alteration in original)).

coarse synchronization of carrier signals.  The '997 patent describes a method and apparatus for fine frequency synchronization using phase shift keying.  These four patents were covered in the Master Agreement and Sublicense Agreement.

On November 13, 2015, Fraunhofer sent a letter to WorldSpace ("Termination Letter") claiming that the Master Agreement "was terminated in the context of the rejection [in bankruptcy]," and "declar[ing] (in the alternative and as a precautionary measure in case the [Master Agreement] has remained yet unterminated) the [Master Agreement] terminated for cause (*außerordentliche Kündigung*) under German law [and] . . . on the basis of the provisions in Section 7.2 and 7.3 of the [Master Agreement]."  J.A. 251.

On February 22, 2017, Fraunhofer sued SXM for infringement the '289 patent, '1084 patent, '3084 patent, and '997 patent in the United States District Court of Delaware.  SXM moved to dismiss the complaint.  Fraunhofer later sought to amend its complaint.  The district court, applying United States law, dismissed Fraunhofer's complaint on the ground that Fraunhofer's sublicense under the Sublicense Agreement was a complete defense to infringement and denied Fraunhofer's motion to amend the complaint on ground of futility.

We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1295(a)(1).  Before oral argument, we issued an order advising that parties be prepared to address:

> 1. Whether the choice of law provision in Section 9.5 of the Master License Agreement requires this court to interpret the Master License Agreement according to German law, and to determine the rights of SXM according to German law.
>
> 2. Whether the application of German law would result in SXM's sublicense rights surviving contract termination of the Master License

Agreement. *See, e.g.*, *M2Trade*, Bundesgerichtshof [BGH] [Federal Court of Justice] July 19, 2012, Entscheidungen des Bundesgerichtshofes in Zivilsachen [BGHZ] 194, 136 (Ger.); *Take Five*, BGH July 19, 2012, Neue Juristische Wochenschrift Rechtsprechungs-Report Zivilrecht [NJW-RR] 2012, 1127 (Ger.).

3. Whether this case should be remanded to the District Court for further proceedings to address the impact of German law on the issues before this court.

Dkt. No. 49.

## DISCUSSION

We review the district court's dismissal under Federal Rule of Civil Procedure 12(b)(6) *de novo*. *See Adams Outdoor Advert. Ltd. P'ship v. Pa. Dep't of Transp.*, 930 F.3d 199, 205 (3d Cir. 2019). When conducting this inquiry, "we accept all factual allegations in the complaint as true and view them in the light most favorable to the plaintiff." *Umland v. PLANCO Fin. Servs.*, 542 F.3d 59, 64 (3d Cir. 2008) (quoting *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006)). The issues are whether the Master Agreement was terminated and, if so, whether that termination had the effect of terminating the sublicense.[3]

---

[3] We note Fraunhofer's argument that the sublicense itself was terminated after WorldSpace's bankruptcy was converted to Chapter 7. Fraunhofer argues that because the Sublicense Agreement was never expressly assumed during bankruptcy proceedings, it was rejected under 11 U.S.C. § 365(d)(1). Fraunhofer further argues that because SXM never made an "affirmative election" of its rights under section 365(n)(1)(B), it relinquished its

rights under the Sublicense Agreement. Appellant's Repl. Br. 27. Section 365(n)(1) provides:

> If the trustee rejects an executory contract under which the debtor is a licensor of a right to intellectual property, the licensee under such contract may elect—
>
> **(A)** to treat such contract as terminated by such rejection if such rejection by the trustee amounts to such a breach as would entitle the licensee to treat such contract as terminated by virtue of its own terms, applicable nonbankruptcy law, or an agreement made by the licensee with another entity; or
>
> **(B)** to retain its rights (including a right to enforce any exclusivity provision of such contract, but excluding any other right under applicable nonbankruptcy law to specific performance of such contract) under such contract and under any agreement supplementary to such contract, to such intellectual property (including any embodiment of such intellectual property to the extent protected by applicable nonbankruptcy law), as such rights existed immediately before the case commenced, for—
>
> > **(i)** the duration of such contract; and
> >
> > **(ii)** any period for which such contract may be extended by the licensee as of right under applicable nonbankruptcy law.

11 U.S.C. § 365(n)(1).

This termination theory is without merit. Even if the Sublicense Agreement had been rejected, SXM has not elected to treat the Sublicense Agreement as terminated as provided under section 365(n)(1)(A). To the extent that SXM has made any election, the record shows that it has

I

We begin by addressing the issue of what law to apply to the Master Agreement. The Master Agreement's choice-of-law provision states: "[t]his Agreement shall be subject to, governed by and construed in accordance with the laws of the Federal Republic of Germany, without giving effect to its conflicts of law provisions." J.A. 488. This provision suggests that questions as to the right to terminate and the consequences of termination on the sublicense would be decided by German law. The real issue is whether foreign law can be waived, and in this respect, we apply regional circuit law.

At oral argument, Fraunhofer asserted that "where parties do not address issues of foreign law, either in the district court, or on appeal, the appellate court will consider that issue waived," Oral Arg. at 1:30, and that even if German law applied, "as a matter of choice of law, [a German court] would look to U.S. law . . . to decide this issue," *id.* at 7:15. SXM asserted that the "outcome is the same" under either German law or U.S. law. *Id.* at 18:40. It noted that "German law applies to the interpretation of the Master License Agreement," *id.* at 18:50, but conceded that the "issue was not addressed by the district court, nor was it raised or argued by the parties," *id.* at 19:20.

Under Third Circuit law, "[t]he parties . . . generally carry both the burden of raising the issue that foreign law may apply in an action, and the burden of adequately

----

elected to "retain its rights" under the Sublicense Agreement in accordance with section 365(n)(1)(B). The result that Fraunhofer urges would be contrary to the purpose of section 365(n), which is to "correct[] the perception . . . that Section 365 was ever intended to be a mechanism for stripping innocent licensee[s] of rights." S. Rep. No. 100-505, pp. 2–4 (1988).

proving foreign law to enable the court to apply it in a particular case." *Bel-Ray Co. v. Chemrite Ltd.*, 181 F.3d 435, 440 (3d Cir. 1999) (citations omitted); *see also Williams v. BASF Catalysts LLC*, 765 F.3d 306, 316 (3d Cir. 2014) ("[P]arties may waive choice-of-law issues."). "Where parties fail to satisfy either burden the court will ordinarily apply the forum's law." *Bel-Ray*, 181 F.3d at 441. Both Fraunhofer and SXM rely on U.S. law in their briefings in this court. At oral argument, both parties conceded that the German law issue was never properly raised before the district court. Therefore, we hold that U.S. law applies.

## II

Under U.S. law, the first question is whether the Master Agreement was properly terminated. Fraunhofer advances four theories as to why the Master Agreement had been terminated. The first of its theories is untenable. Contrary to Fraunhofer's argument, WorldSpace's rejection of the Master Agreement in bankruptcy did not unilaterally terminate the Master Agreement. As noted earlier, the Supreme Court held in *Mission Prod. Holdings, Inc. v. Tempnology, LLC*, "[a] rejection breaches a contract but does not rescind it." 139 S. Ct. 1652, 1657–58 (2019). Therefore, WorldSpace's rejection does not "terminate the contract" or "vaporize[]" SXM's rights. *Id.* at 1659 (alteration in original) (quoting *In re Tempnology LLC*, 559 B.R. 809, 822 (B.A.P. 1st Cir. 2016)). But Fraunhofer has three other more plausible theories.

*First*, Fraunhofer argues that under *Mission Products*, WorldSpace's rejection of the Master Agreement during bankruptcy proceedings gave Fraunhofer the right to terminate the Master Agreement, which it exercised its November 13, 2015, Termination Letter.

*Second*, Fraunhofer argues that WorldSpace's bankruptcy proceeding created a right to terminate the Master Agreement. Section 7.3 of the Master Agreement provides that if any party is subjected to bankruptcy proceedings,

the other party "may, by written notice, terminate [the Master Agreement] immediately." J.A. 486.

*Third*, Fraunhofer directs us to section 7.2 of the Master Agreement, which provides that if any party "substantially fails to comply with any of its obligations under [the Master Agreement] and does not remedy the failure of performance within ninety (90) days after it has been notified in writing thereof, the other party may, by written notice, terminate this Agreement at the end of said period." J.A. 486. Fraunhofer contends that section 7.2 authorized it to terminate the Master Agreement because WorldSpace failed to make required payments under section 4.2 of the agreement.

Section 4.2 provides that WorldSpace "shall reimburse [Fraunhofer] for all reasonable fees and costs incurred in connection with the preparation, filing and prosecution of MCM Intellectual Property Rights for the countries designated by [WorldSpace]." J.A. 484. On November 4, 2010, Fraunhofer invoiced WorldSpace for €16,024.57 in "Attorney fees/Annual fees" related to the prosecution of European counterparts to the patents-in-suit—fees that did not result from the "preparation, filing, and prosecution" of the U.S. patents-in-suit and were incurred after WorldSpace entered bankruptcy proceedings. J.A. 491. Fraunhofer asserts that WorldSpace's failure to pay these fees—a default acknowledged by WorldSpace in 2010—constituted a breach under section 4.2, and WorldSpace's failure to remedy its breach within 90 days allowed Fraunhofer to terminate the Master Agreement.

In sum, Fraunhofer has three plausible arguments that it had a right to terminate the Master Agreement. However, it is unclear whether Fraunhofer, assuming that it had a right to terminate the Master Agreement, properly terminated the agreement. For example, it is a general rule of contract law that a party exercising the right to terminate the contract must give notice within a reasonable

time.  *See, e.g.*, 15 Williston on Contracts § 48:7 (4th ed. 2019) ("[T]he uniformly held view [is] that if no time is specified, notice within a reasonable time is an implied condition."); 13 Corbin on Contracts § 68.9 (2019) (discussing notice as a condition precedent to the exercise of the power to terminate a contract); *Passaic Valley Sewerage Comm'rs v. Holbrook, Cabot & Rollins Corp.*, 6 F.2d 721, 724 (3d Cir. 1925) ("It is, of course, a general principle of law that a party who desires to rescind a contract must do so within a reasonable time after discovering the ground for rescission."); *Westfed Holdings, Inc. v. United States*, 407 F.3d 1352, 1361 (Fed. Cir. 2005) ("Implied waiver may be inferred by conduct or actions that mislead the breaching party into reasonably believing that the rights to a claim arising from the breach was waived."); *N. Helex Co. v. United States*, 455 F.2d 546, 551 (Ct. Cl. 1972) ("As a general proposition, one side cannot continue after a material breach by the other (such as failure to pay), act as if the contract remains fully in force (although stopping performance would be fair and convenient), run up damages, and then go suddenly to court.").

SXM argued before the district court that the Master Agreement was not terminated.  The district court has not decided this issue, and neither do we.  This issue must be addressed upon remand.

III

Assuming *arguendo* that the Master Agreement was terminated by the Termination Letter, the second question is whether SXM's sublicense rights nonetheless survived. The district court held that even if the Master Agreement was terminated, that termination only barred WorldSpace from granting future licenses and did not affect the sublicense it had already granted to SXM.  "[T]he interpretation of private contracts is ordinarily a question of state law. . . ." *Volt Info. Scis., Inc.* v. *Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 474 (1989).  The parties here,

in their invocations of U.S. law instead of German law, do not argue for application of any particular state's law, but discuss U.S. law generally. Moreover, we have applied Federal Circuit law in several circumstances where the interpretation of a contract is "intimately bound up" with an issue of patent law.[4] The question here is whether the sublicense could survive the termination of the Master Agreement, *i.e.*, whether SXM retained a license that negates infringement under 35 U.S.C. § 271, even after WorldSpace's own license rights were terminated. In the circumstances presented, we apply Federal Circuit law based on relevant U.S. law principles generally.

We first note that our law does not provide for automatic survival of a sublicense. The district court relied on this court's citations to patent treatises in *Rhone-Poulenc* for the proposition "that a sublicense continues, even when the principal license is terminated for breach of contract." J.A. 5–6 (citing *Rhone-Poulenc Agro, S.A. v. DeKalb*

---

[4] *See Intellectual Ventures I LLC v. Erie Indem. Co.*, 850 F.3d 1315, 1320 n.1 (Fed. Cir. 2017); *SiRF Tech., Inc. v. ITC*, 601 F.3d 1319, 1326 (Fed. Cir. 2010) (applying Federal Circuit law to determine whether an agreement provides for automatic assignment); *DDB Techs., L.L.C. v. MLB Advanced Media, L.P.*, 517 F.3d 1284, 1290 (Fed. Cir. 2008) (similar); *Rhone-Poulenc Agro, S.A. v. DeKalb Genetics Corp.*, 284 F.3d 1323, 1328 (Fed. Cir. 2002) (holding that "the bona fide purchaser defense to patent infringement is a matter of federal law" and explaining role of uniformity policy in whether state or federal law governs issues); *Flex-Foot, Inc. v. CRP, Inc.*, 238 F.3d 1362, 1365 (Fed. Cir. 2001) (holding that Federal Circuit law controls when "the underlying substance of [an argument as to waiver of claims and defenses in a settlement agreement] . . . is intimately related with the substance of enforcement of a patent right.").

*Genetics Corp.*, 284 F.3d 1323, 1332 n.7 (Fed. Cir. 2001) (citing Ridsdale Ellis, *Patent Licenses* § 62 (3d ed. 1958) and Brian G. Brunsvold & Dennis P. O'Reilley, *Drafting Patent License Agreements* 37 (BNA 4th ed. 1998))). However, in *Rhone-Poulenc*, this court dealt with a different issue, and our only conclusion was that "[t]hese treatises do not address the operation of the bona fide purchaser rule with respect to sublicenses and do not state or suggest that a sublicense continues even when the principal license is rescinded because it has been obtained by fraud." *Rhone-Poulenc*, 284 F.3d at 1332. *Rhone-Poulenc* does not stand for the proposition that a district court may forgo contract interpretation and assume that a sublicense survives by operation of law.

Equally, the fact that WorldSpace had continuing obligations under the agreement at the time of termination does not automatically mean that the survival of the sublicense upon termination of the Master Agreement was dependent on the performance of those obligations under the Master Agreement. It may be that the sublicense grant was complete and irrevocable before the termination of the Master Agreement. Under such circumstances the sublicensor, at the time of the grant of the sublicense, would not be conveying more to the sublicensee than it had received from the master licensor.[5] Nor is this a situation in which

---

[5]    *See, e.g.*, *TransCore, LP v. Elec. Transaction Consultants Corp.*, 563 F.3d 1271, 1275 (Fed. Cir. 2009) (holding that "our analysis begins with the premise that one cannot convey what one does not own," but that "the pertinent question [in these contexts] is . . . what the [agreement] authorizes."). Nor is this a case where, as in *Mitchell v. Hawley*, 83 U.S. 544, 550 (1873), the master licensee (sublicensor) could not convey rights that it had not acquired, i.e. the right to grant a license that extended beyond the term of the patent.

the sublicensee has allegedly violated the terms of the sublicense. In short, the survival of the sublicensee's rights depends on the interpretation of the Master Agreement.

There is no provision of the Master Agreement that directly addresses the question of sublicense survival, though we are confident that in the future, parties to license contracts will resolve this issue by including contract language specifically addressing the survival of sublicense rights. To the extent that the language of the Master Agreement here provides any guidance, we find it to be equivocal. Section 3.1 provides that the Master Agreement license is "irrevocable," stating that "[Fraunhofer] grants to [WorldSpace] and its Affiliates a worldwide, exclusive, irrevocable license, with the right to sublicense, under the MCM Intellectual Property Rights to make, have made, use, have used, sell, or have sold MCM Technology (and products and services incorporating or utilizing the MCM Technology) in connection with WorldSpace Business." J.A. 483.

On the other hand, section 7.4 states that "[n]o termination or expiration of this Agreement shall effect [sic] the rights and licenses granted to [WorldSpace] under [section 3], provided that [WorldSpace] has paid (or has agreed in writing to pay) all of the amounts specified in [section 4] as of the date of termination or expiration." J.A. 486. Fraunhofer argues that WorldSpace has not made the required payments so the sublicense rights are affected.

Furthermore, section 7.5 provides that "[n]o termination or expiration of this Agreement shall prevent the continued use by customers of [WorldSpace] (or by customers of [WorldSpace]'s Affiliates, licensees and sublicensees) of products or services sold prior to the date of termination or expiration." J.A. 485. Fraunhofer argues that this provision gives rise to a negative inference that all sublicense rights do not survive termination as to products or services sold after the date the date of termination.

On its face, the Master Agreement is ambiguous as to whether the sublicensee's rights survive the termination of the Master Agreement. Where, as here, a contract is ambiguous, courts must consider extrinsic evidence of the surrounding circumstances to determine the intent of the parties. Restatement (Second) of Contracts, § 212 ("A question of interpretation of an integrated agreement is to be determined by the trier of fact if it depends on the credibility of extrinsic evidence or on a choice among reasonable inferences to be drawn from extrinsic evidence."); 5 Corbin on Contracts § 24.10 (2019) ("[E]xtrinsic evidence [may] be admitted to make the court aware of the surrounding circumstances."); 11 Williston on Contracts § 33:42 (4th ed. 2019) ("[T]here is unanimity [among courts] that the surrounding circumstances may be considered when an ambiguity [in a contract] does exist."). This issue cannot be properly resolved on a motion to dismiss and remand is necessary to enable the parties to establish an appropriate record and for the district court to make necessary factual findings.

On remand, if the district court finds that Fraunhofer properly terminated the Master Agreement, it must also consider extrinsic evidence from the parties to resolve this contract ambiguity concerning the survival of the sublicense. The district court should consider relevant facts including: (1) the fact that SXM had performed all its obligations under the Sublicense Agreement at the time of the alleged termination of the Master Agreement, (2) Fraunhofer's knowledge of and agreement to the terms of the Sublicense Agreement and the amendments made to the Sublicense Agreement, (3) whether the parties discussed SXM's long-term reliance on the license's validity, (4) Fraunhofer's own role in constructing the allegedly infringing devices and the parties' assumptions that a license would be required for SXM's continued use of the devices, (5) other discussions among Fraunhofer, WorldSpace, and SXM before and after the execution of the relevant

agreements that may shed light on the effect of a termination of the Master Agreement on the sublicense, and (6) commercial practices and custom, particularly as it relates to the default rule that should apply if the agreement remains ambiguous after considering extrinsic evidence as to the parties' conduct. We do not limit the district court's consideration to these items; other evidence may well be relevant. We need not now determine what default rule should apply if contract interpretation does not answer the question of sublicense survival. Although the district court should consider extrinsic evidence, we do not preclude its resolution of this issue on summary judgment if appropriate.

Therefore, we vacate the order dismissing the complaint for failure to state a claim and remand for further proceedings.

IV

Fraunhofer argues that the district court erred by denying Fraunhofer's motion to amend its complaint on the ground that SXM's sublicense defense was a "complete defense to infringement" and that "any attempt to amend the complaint would be futile." J.A. 7. Fraunhofer's proposed amendment included factual allegations as to the circumstances surrounding the Master Agreement and Sublicense Agreement. J.A. 1188 ("[SXM] understood that any rights to the [patents-in-suit] conveyed by the [Sublicense Agreement] were derivative of the license rights granted from Fraunhofer to WorldSpace under the [Master Agreement]."), 1189 ("The use of the word 'irrevocable' in the context of the [Master Agreement] and [Sublicense Agreement] was not and is not understood to mean that the patent rights granted thereunder could never be extinguished . . . ."). Fraunhofer also attached relevant documents that the district court could not otherwise have considered on a motion to dismiss, including the Termination Letter and its technical consulting contract with SXM.

> In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be "freely given."

*Foman v. Davis*, 371 U.S. 178, 182 (1962).

As discussed above, the district court erred by not considering extrinsic evidence of the parties' intent—evidence that Fraunhofer attempted to offer in its proposed amended complaint. Under these circumstances we think the amendment should have been allowed. Therefore, we reverse the district court's denial of Fraunhofer's motion to amend.

## CONCLUSION

For the foregoing reasons, we vacate the district court's grant of SXM's motion to dismiss, reverse its denial of Fraunhofer's motion to amend and remand for further proceedings consistent with this opinion.

**VACATED-IN-PART, REVERSED-IN-PART, AND REMANDED**

### COSTS

No costs.