# United States Court of Appeals
# for the Federal Circuit

———————————

**ABBOTT POINT OF CARE INC.,**
*Plaintiff-Appellant,*

v.

**EPOCAL, INC.,**
*Defendant-Appellee.*

———————————

2011-1024

———————————

Appeal from the United States District Court for the Northern District of Alabama in Case No. 09-CV-1678, Chief Judge Sharon Lovelace Blackburn

———————————

Decided: January 13, 2012

———————————

GREGORY A. CASTANIAS, Jones Day, of Washington, DC, argued for plaintiff-appellant. With him on the brief were JASON G. WINCHESTER and DENNIS MURASHKO, of Chicago, Illinois.

J. ANTHONY DOWNS, Goodwin Procter, LLP, of Boston, Massachusetts, argued for defendant-appellee. With him on the brief were DARYL L. WIESEN and SAFRAZ W. ISHAMAEL.

———————————

Before RADER, *Chief Judge*, LOURIE, and BRYSON, *Circuit Judges*.

Opinion for the court filed by *Chief Judge* RADER. Dissenting opinion filed by *Circuit Judge* BRYSON.

RADER, *Chief Judge*.

The United States District Court for the Northern District of Alabama granted Epocal, Inc.'s ("Epocal") Motion to Dismiss and dismissed Abbott Point of Care Inc.'s ("Abbott") Complaint without prejudice. Because Abbott lacks standing, this court affirms.

## I.

Abbott filed a complaint against Epocal in the Northern District of Alabama alleging infringement of U.S. Patent Nos. 6,845,327 ('327 patent) entitled "Point-Of-Care In-Vitro Blood Analysis System" and 6,896,778 ('778 patent) entitled "Electrode Mode." These patents cover systems and devices for testing blood samples. Abbott and Epocal are competitors in the diagnostic field. Abbot is a New Jersey corporation that manufactures and sells a variety of healthcare products, including point-of-care systems that enable medical professionals to quickly test blood without sending a sample away to a lab. Epocal is a Canadian corporation founded by Dr. Imants Lauks, the named inventor of the patents-in-suit. Likewise, Epocal manufactures and sells point-of-care blood testing systems. Both parties claim to own the '328 and '772 patents. Both patents name Epocal as the assignee. Abbott claims ownership on the basis of contracts between Lauks and Abbott's predecessors. Lauks entered into three contracts: two employment agreements and one consulting agreement.

Before founding Epocal, Lauks was an employee of Abbott's predecessors, Integrated Ionics Incorporated ("Integrated Ionics") and i-STAT Corporation ("i-STAT"). Lauks executed an employment agreement with Integrated Ionics on January 10, 1984 ("1984 Agreement"), which included confidentiality, non-competition, non-solicitation, disclosure and assignment provisions. In relevant part, the agreement provided that:

> I [Lauks] agree to promptly communicate to Integrated Ionics, and to assign to Integrated Ionics or its designee all of my rights in, any inventions, improvements or discoveries, whether patentable or not, which I currently own or possess or which I may make or conceive during my employment by Integrated Ionics or which relate to any present or prospective activities of Integrated Ionics; and I hereby assign to Integrated Ionics and authorize and request competent patent authorities, domestic and foreign, to honor and recognize this document as a full and complete assignment thereof.

J.A. 231-32 ("Disclosure and Assignment Covenant"). Integrated Ionics subsequently became i-STAT. Lauks executed an employment agreement with i-STAT on January 29, 1992 ("1992 Agreement"). The 1992 Agreement included Lauks' employment duties, compensation, benefits, termination, and severance payments.

Lauks resigned from i-STAT on September 1, 1999. At that time, he signed an eighteen-month consulting agreement with i-STAT ("1999 Consulting Agreement"), which expired on March 1, 2001. The 1999 Consulting Agreement notes that Dr. Lauks "resigns from all his

positions" at i-STAT. The 1999 Agreement then defines Lauks' exclusive consulting services and specifies that "[t]he Consulting Agreement does not extend to work on new products, whether or not based on [i-STAT's] core technology and whether or not for point-of-care blood analysis applications." *Id.* The agreement gave i-STAT and Lauks a flexible work schedule, particularly "recognizing Lauks' desire to pursue other, non-conflicting interests." *Id.* The confidentiality provision noted "the existing agreement between Lauks and [i-STAT] regarding confidentiality, non-solicitation and non-competition (the 'Existing Confidentiality Agreement') shall remain in place as if Lauks remained employed by [i-STAT], except that the covenants regarding non-competition shall run 18 months after the execution of the Consulting Agreement." J.A. 70. The 1999 Consulting Agreement does not address invention assignments or obligations.

On June 4 and June 8, 2001, Lauks filed applications that led to the '328 and '772 patents, identifying himself as the sole inventor. In December 2003, Lauks assigned the patents-in-suit to Epocal. Abbott acquired i-STAT in 2004.

On August 25, 2009 Abbott filed its Complaint asserting infringement and legal title to the contested patents. Citing the 1984 Agreement, Abbott alleged Lauks agreed to disclose and assign his inventions, improvements, and discoveries to its predecessor, Integrated Ionics. Abbott also referenced the 1999 Consulting Agreement, alleging it expressly recognized that the 1984 Agreement remained in effect for the duration of Lauks' consulting period, specifically the provision assigning all Lauks' rights in inventions, improvements, or discoveries. The Complaint further alleged that Lauks conceived the contested inventions before March 1, 2001, thus giving Abbott ownership rights.

Epocal filed a motion to dismiss for lack of subject matter jurisdiction and failure to state a claim. In its opposition to Epocal's motion to dismiss, Abbott requested limited jurisdictional discovery if the district court determined extrinsic evidence was necessary to construe the 1999 Agreement. In addition, Abbott filed a motion for an *in camera* review of a "clawed back" privileged letter, which related to the 1984 Agreement, and a motion to compel discovery and determine the status of the privileged letter. In response, Epocal filed a motion to stay or strike Abbott's privilege motions.

During oral arguments, the district court granted Abbott's motion for an *in camera* review. The district court issued a memorandum opinion and order that granted Epocal's motion to dismiss. The district court found Abbott lacked standing because the 1999 Consulting Agreement did not continue the 1984 Agreement's Disclosure and Assignment Covenant. Therefore, Abbott did not own the patents-in-suit. The district court declined as moot Abbott's motion to compel discovery and determine the status of the 2000 letter. The trial court also declined to entertain Epocal's motion to stay or strike Abbott's privilege motions. The district court entered final judgment on September 7, 2010. Abbott appealed, and this court has jurisdiction under 28 U.S.C. § 1295(a)(1).

## II.

This court reviews standing to sue for patent infringement without deference. *See Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1551 (Fed. Cir. 1995) (en banc). Only a patentee may bring an action for patent infringement. *See* 35 U.S.C. § 281 ("A patentee shall have remedy by civil action for infringement of his patent."). Title 35 defines "patentee" as the party to whom the patent issued or any successors in title to the patent. *See* 35 U.S.C. §

100(d). Transfers of title, otherwise known as assignments, are controlled by 35 U.S.C. § 261:

> Applications for patent, patents, or any interest therein, shall be assignable in law by an instrument in writing. The applicant, patentee, or his assigns or legal representatives may in like manner grant and convey an exclusive right under his application for patent, or patents, to the whole or any specified part of the United States.

Accordingly, a patentee or successor in title to the patentee may bring an action for patent infringement. *See Mentor H/S, Inc. v. Med. Device Alliance, Inc.*, 240 F.3d 1016, 1017 (Fed.Cir. 2001).

This court also reviews contract interpretations without deference. *See Spring Creek Holding Co. v. Shinnihon U.S.A. Co.*, 943 A.2d 881, 900 (N.J. Super. Ct. App. Div. 2008). Finally, this court reviews "the district court's denial of discovery, an issue not unique to patent law, for abuse of discretion, applying the law of the regional circuit," here the United States Court of Appeals for the Eleventh Circuit. *Patent Rights Prot. Group, LLC v. Video Gaming Techs., Inc.*, 603 F.3d 1364, 1371 (Fed. Cir. 2010).

Abbott has the burden to show necessary ownership rights to support standing to sue. *See Fieldturf, Inc. v. Southwest Recreational Indus., Inc.*, 357 F.3d 1266, 1269 (Fed. Cir. 2004). Abbot asserts that the 1984 Agreement, as carried forward by the 1999 Consulting Agreement, gave it ownership of the '328 and '772 patents.

State law governs contract interpretation. *See Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings*, 370

F.3d 1354, 1369 (Fed. Cir. 2004). Thus, the law of the state of New Jersey governs these Agreements. In interpreting a contract, it is "well-settled . . . that when the terms of a contract are clear, 'it is the function of a court to enforce it as written and not to make a better contract for either of the parties.'" *CSFB 2001-CP-4 Princeton Park Corporate Ctr., LLC v. SB Rental L LLC*, 980 A.2d 1, 4 (N.J. Super. Ct. App. Div. 2009) (quoting *Kampf v. Franklin Life Ins., Co.*, 161 A.2d 717 (N.J. 1960); *see also Borough of Princeton v. Bd. of Chosen Freeholders of Cnty. of Mercer*, 755 A.2d 637, 645 (N.J. Super. Ct. App. Div. 2000) ("The polestar of contract construction is to discover the intention of the parties as revealed by the language used by them."). Therefore, "[a]bsent ambiguity, the intention of the parties is to be ascertained by the language of the contract." *CSFB 2001-CP-4*, 980 A.2d at 4.

Lauks' resignation from i-STAT terminated his employment. Accordingly, the 1984 and 1992 Agreements ended when he ceased to be an employee in 1999. The 1999 Agreement echoes this termination, stating that Lauks "resigns from all his positions" at i-STAT. Further, the 1999 Consulting Agreement labels Lauks as a "Senior Consultant."

The 1999 Consulting Agreement did not specify that the entire 1984 Agreement remains in effect for the duration of Lauks' consulting period. The confidentiality provision of the 1999 Consulting Agreement, entitled "Continuation of Employee Confidentiality, Non-Solicitation and Non-Competition Covenants," simply retains the existing confidentiality agreement in place. That provision is explicitly limited to confidentiality, non-solicitation, and non-competition, without any reference to any obligation to assign inventions:

> The existing agreement between Lauks and [i-STAT] regarding confidentiality, non-solicitation and non-competition (the "Existing Confidentiality Agreement") shall remain in place as if Lauks remained employed by [i-STAT], except that the covenants regarding non-competition shall run 18 months after the execution of the Consulting Agreement.

J.A. 70.

While the 1984 Agreement contained a Disclosure and Assignment Covenant, the 1999 Consulting Agreement does not contain any obligation that Lauks must assign rights in inventions, improvements, or discoveries made or conceived during the consultation period. Rather, the 1999 Consulting Agreement recognized and allowed Lauks to pursue other, non-conflicting interests. It also explicitly excluded work on new products, regardless of the subject matter, including point-of-care blood analysis applications. Abbott's proposed interpretation of the Agreements as containing a continued assignment obligation finds no support in the documents themselves. An automatic assignment of "inventions, improvements or discoveries" conceived while pursuing other interests directly conflicts with the agreement's allowance that Lauks may work on his own behalf. Moreover, the plain language of the 1999 Consulting Agreement is unambiguous and does not continue the 1984 Agreement's Disclosure and Assignment Covenant. *See Borough of Princeton*, 755 A.2d at 645 (N.J. Super. App. Div. 2000) ("The document, moreover, must be read as a whole, without artificial emphasis on one section, with a consequent disregard for others."). Because the 1999 Consultation Agreement is silent with respect to any assignment of Lauks' rights in inventions, improvements, or discoveries

made or conceived during the consultation period, Lauks had no obligation to assign inventions from the consulting period to i-STAT. Thus, as the district court correctly concluded, the contract does not convey all substantial interest in the '328 or '772 patents.

Although the 1999 Consulting Agreement was unambiguous, Abbott faults the district court for denying Abbott's request for additional discovery. New Jersey law explains that extrinsic evidence is admissible to aid in contract interpretation, but it is "not for the purpose of modifying or enlarging or curtailing its terms" *Conway v. 287 Corporate Ctr. Assocs.*, 901 A.2d 341, 346-47 (N.J. 2006); *see also Dontzin v. Myer*, 694 A.2d 264, 267 (N.J. Super. Ct. App. Div. 1997) ("Extrinsic evidence is admissible as an aid to understand the significance of the contract language, but not to give effect to an intent at variance with that language."). Because the agreements contain no ambiguity, Abbott's request is unavailing. Extrinsic evidence simply cannot change or contradict the contract's language. As such, the district court properly evaluated all of the agreements between Lauks and Abbott's predecessors, considered the entirety of the contracts, and reasoned the contract language unambiguously conveyed the parties' intention. Therefore, the district court did not abuse its discretion in denying jurisdictional discovery. *United Technologies Corp. v. Mazer*, 556 F.3d 1260, 1281 (11th Cir. 2009) (affirming the district court's denial of jurisdictional discovery).

Because Abbott lacks standing, the district court properly dismissed its claim.

**AFFIRMED**

# United States Court of Appeals
# for the Federal Circuit

---

**ABBOTT POINT OF CARE INC.,**
*Plaintiff-Appellant,*

v.

**EPOCAL, INC.,**
*Defendant-Appellee.*

---

2011-1024

---

Appeal from the United States District Court for the Northern District of Alabama in Case No. 09-CV-1678, Chief Judge Sharon Lovelace Blackburn.

---

BRYSON, *Circuit Judge*, dissenting.

In order to understand the meaning of the 1999 Consulting Agreement, it is necessary to examine not only that agreement, but the two prior agreements that provide the context and, by incorporation, at least some of the content of the 1999 agreement. The prior agreements between Dr. Lauks and Abbott's corporate predecessors are an untitled 1984 agreement, which outlined various aspects of Dr. Lauks's rights and responsibilities as an employee, and a 1992 document entitled "Employment Agreement," which incorporated the covenants of the 1984 agreement. The 1984 agreement contained an assignment-of-invention clause. The 1999 Consulting Agreement does not contain an explicit assignment-of-invention

clause, but it contains a provision that incorporates at least some of the covenants found in the 1992 and 1984 agreements. The question in this case is whether the assignment-of-invention clause from the 1984 and 1992 agreements was incorporated by reference in the 1999 agreement. The majority states that the 1999 Consulting Agreement "does not contain any obligation that Lauks must assign rights in inventions, improvements, or discoveries made or conceived during the consultation period," and that the 1999 agreement "is unambiguous and does not continue the 1984 Agreement's Disclosure and Assignment Covenant." I disagree with that conclusion. I believe that the 1999 Consulting Agreement is at least ambiguous as to whether it incorporated the assignment covenant of the 1984 agreement. I would therefore vacate the judgment of the district court and remand this case for discovery and consideration of extrinsic evidence regarding whether, and to what extent, the 1999 Consulting Agreement incorporated the assignment-of-invention clause that was first found in the 1984 agreement.

Abbott and Epocal agree that by signing the 1984 agreement, Dr. Lauks assumed obligations related to confidentiality, non-competition, non-solicitation, disclosure of inventions, and, most importantly for our purposes, assignment of inventions. Abbott and Epocal also agree that in the 1992 Employment Agreement Dr. Lauks and i-STAT referenced the entirety of the 1984 agreement in two ways. First, they assigned a shorthand title to the untitled 1984 document: the "Confidentiality and Non-Competition Agreement." That shorthand title did not, of course, include specific reference to all of the covenants of the 1984 agreement, but it was clearly intended to refer to the entire 1984 agreement with all of its covenants, including the assignment-of-invention clause. Second, Dr. Lauks and i-STAT identified the 1984 agreement by

describing some, but not all, of the subject matter of that agreement. They did so by referring to the 1984 agreement as the "certain letter agreement . . . concerning employee confidentiality and non-competition." Even though the 1992 Employment Agreement does not use the word "assignment," Epocal acknowledges that Dr. Lauks's assignment obligations from the 1984 agreement carried over into the 1992 agreement because the 1992 agreement incorporated all of the obligations imposed on Dr. Lauks by the 1984 agreement.

In the 1999 Agreement, Dr. Lauks and i-STAT continued their practice of referring to the untitled 1984 agreement with a shorthand title; in 1999 they referred to it as the "Existing Confidentiality Agreement." Moreover, as in the 1992 agreement, the 1999 agreement made reference to the 1984 document without listing each of the covenants found in that agreement. The 1999 agreement described the 1984 agreement as "the existing agreement . . . regarding confidentiality, non-solicitation, and non-competition."

Epocal's position is that the 1999 agreement, unlike the 1992 agreement, carried forward only the three listed covenants (confidentiality, non-solicitation, and non-competition) and not the rest of the covenants from the 1984 agreement. The problem with that position is that, if the assignment obligation found in the 1984 agreement was incorporated into the 1992 agreement (and Epocal agrees that it was), there is no reason to interpret the similar terms of the 1999 agreement to exclude the assignment obligation.

The differences between the 1992 and 1999 agreements with respect to the manner in which they refer to the 1984 agreement are minor. First, the 1992 and 1999 agreements use slightly different language to refer to the

1984 agreement ("Confidentiality and Non-Competition Agreement" in 1992, and "Existing Confidentiality Agreement" in 1999), but it is clear that both are simply shorthand references to the 1984 agreement. Second, the 1992 agreement refers to the 1984 agreement as the agreement "concerning employee confidentiality and non-competition," while the 1999 agreement refers to the 1984 agreement as the agreement "regarding confidentiality, non-solicitation and non-competition." Again, it is quite plain that both references are to the 1984 agreement. Accordingly, if the quoted language in the 1992 agreement refers to the 1984 agreement as a whole—as Epocal concedes—the similar quoted language from the 1999 agreement would appear to have the same meaning.

In arguing to the contrary, Epocal places great weight on the fact that the 1992 agreement permitted Dr. Lauks to be terminated for breach of "any of the covenants" in the 1992 Employment Agreement or in the 1984 agreement. The 1999 agreement, however, has substantially similar language, stating that Dr. Lauks could be terminated for breach "of any material covenant in the Consulting Agreement (including the Existing Confidentiality Agreement . . . )." Moreover, in light of the parties' practice of referring to the 1984 agreement by reference to fewer than all of its covenants, the fact that the section of the 1999 agreement defining "Existing Confidentiality Agreement" is titled "Continuation of Employee Confidentiality, Non-Solicitation and Non-Competition Covenants" is not sufficient to establish that the 1999 agreement was intended to exclude any form of the assignment covenant found in the prior agreements.

It is true that the 1992 agreement was an employment agreement whereas the 1999 agreement was a consultancy agreement. However, the change in the nature of Dr. Lauks's relationship with i-STAT does not

suggest that the parties intended to deviate from their established practice of identifying the entirety of the 1984 agreement with a shorthand name consisting of a reference to some, but not all, of the covenants contained in that 1984 document. Because I disagree with the majority's conclusion that the 1999 Consulting Agreement unambiguously excludes any version of the assignment obligation initially contained in the 1984 agreement, I would reverse the district court's dismissal order. I would direct the district court on remand to permit discovery and to consider extrinsic evidence bearing on whether the parties contemplated that Dr. Lauks would continue to have an assignment obligation with respect to inventions made in the course of his work for i-STAT and, if so, whether either of the inventions at issue in this case fall within the scope of that assignment obligation.